# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**DAVID LYNCH,**

      **Petitioner,**

v.                                       **Civil Action No. 2:08cv11**
                                        **Criminal Action No. 2:01cr12-1**
                                        **(Judge Maxwell)**

**UNITED STATES OF AMERICA,**

      **Respondent.**

## OPINION/REPORT AND RECOMMENDATION

On January 10, 2008, the *pro se* petitioner filed a Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody. (CR Dckt. 139, CV 1). On October 1, 2008, the undersigned determined that summary dismissal of the petition was not warranted and the respondent was directed to file an answer. (CR Dckt. 147). The United States filed a response to the petition on October 28, 2008. (CR Dckt. 149). The petitioner has not filed a reply. This case is before the undersigned for a preliminary review and Report and Recommendation pursuant to Standing Order No. 4 and LR PL P 83.15, *et seq*.

### I. Procedural History

**A. Conviction and Sentence**

On June 7, 2001, petitioner and his accomplice were charged with one count of manufacturing more than five (5) grams of methamphetamine (actual) in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(B). (CR Dckt. 11). Petitioner's co-defendant pled guilty prior to trial. On the first day of trial, April 8, 2002, petitioner chose to plead guilty to the charge. (CR Dckt. 148 at

13). On November 21, 2003, petitioner was sentenced to 365 months imprisonment. (CR Dckt. 101).

**B.     First Direct Appeal**

Petitioner filed notice of a direct appeal of his sentence to the Fourth Circuit Court of Appeals on November 26, 2003. (CR Dckt. 104). As grounds therein, the petitioner asserted the following:

(1) Did the District Court violate the Sixth Amendment by refusing to permit a jury trial and engaging in judicial fact-finding resulting in a sentence drastically exceeding the conduct admitted by David Lynch?

(2) Were the District Court's factual findings, which substantially increased David Lynch's punishment clearly erroneous and in violation of the Sixth Amendment?

(3) Whether applying the Sentencing Guidelines in an advisory fashion conflicts with clear Congressional intent and is accordingly, unconstitutional?

This sentence was affirmed by the Fourth Circuit on June 22, 2004. (CR Dckt. 111). Petitioner then filed a writ of certiorari with the United States Supreme Court, which granted certiorari and remanded the case back to the Fourth Circuit for further consideration pursuant to United States v. Booker, 543 U.S. 220, 125 S. Ct. 738 (2005) and United States v. Hughes, 401 F.3d 540 (4th Cir. 2005). (CR Dckt. 145). David Lynch v. United States, 543 U.S. 1114, 125 S. Ct. 1083 (Jan 24, 2005).

On September 29, 2005, the Fourth Circuit vacated the sentence and remanded to the District Court for re-sentencing. (Cr. Dckt.118). Mandate issued on October 21, 2005. (4th Cir. Dckt. 61) (03-4926). Pursuant to the remand, on January 23, 2006 this Court re-sentenced the petitioner to the same sentence he originally received on November 21, 2003. (Cr. Dckt. 127).

**C.     Second Direct Appeal**

Petitioner filed notice of a second direct appeal of his conviction and sentence on January 27, 2006. (CR Dckt. 130). As grounds therefore, the petitioner asserted the following:

(1) Whether his Constitutional rights were violated by the Court's failure to conduct a jury trial to render factual determinations relating to the quantity of drugs and other misconduct utilized for sentencing purposes;

(2) Whether the application of the United States Sentencing Guidelines in an advisory fashion violated clear Congressional intent and constituted a Constitutional violation; and

(3) Whether the Court incorrectly calculated the defendant's relevant conduct.

On July 31, 2006, the Fourth Circuit Court of Appeals affirmed the petitioner's conviction and sentence by unpublished opinion (CR Dckt. 135). After denying petitioner's motion for rehearing en banc (4th Cir. Dckt. 41) (06-4129), the Fourth Circuit's mandate issued on September 13, 2006. (CR Dckt. 137). On November 24, 2006, petitioner filed a writ of certiorari with the United States Supreme Court. (4th Cir. Dckt. 47) (06-4129), which was denied on January 8, 2007. <u>David Lynch v. United States</u>, 127 S.Ct. 1008, 166 L.Ed.2d 760 (Jan. 8, 2007). On January 8, 2008, petitioner mailed this § 2255 petition.

**C.    Federal Habeas Corpus**

  **Petitioners' Contentions (CR Dckt. 139, CV Dckt. 1)**

In his federal habeas petition, the petitioner raises two issues for relief, both alleging ineffective assistance of counsel:

(1) Whether his counsel was ineffective for failing to challenge the government's calculation of drug quantity during trial and at sentencing; and

(2) Whether his counsel was ineffective for failing to challenge on appeal the district court's denial of his July 6, 2001 Motion to Suppress Evidence.

  **Government's Response (CR Dckt. 149)**

In its response, the government contends:

(1) Petitioner's first complaint is without basis as defense counsel did in fact litigate the issue of drug quantity; and

(2) The petitioner's second complaint is contrary to law, of which he was advised when he chose to plead guilty.

## II. <u>Analysis</u>

"A petitioner collaterally attacking his sentence or conviction bears the burden of proving that his sentence or conviction was imposed in violation of the Constitution or laws of the United States, that the court was without jurisdiction to impose such a sentence, that the sentence exceeded the maximum authorized by law, or that the sentence otherwise is subject to collateral attack. 28 U.S.C. § 2255. A motion collaterally attacking a petitioner's sentence brought pursuant to § 2255 requires the petitioner to establish his grounds by a preponderance of the evidence." <u>Sutton v. United States of America</u>, 2006 WL 36859 *2 (E.D.Va Jan. 4, 2006).

**<u>Ineffective Assistance of Counsel</u>**

In <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), the Supreme Court of the United States established a two-part test for determining whether a convicted person is entitled to relief on the ground that his counsel rendered ineffective assistance. The first prong of the test requires that the petitioner demonstrate that counsel's performance was deficient and "fell below an objective standard of reasonableness." <u>Strickland</u> at 688. The second prong requires the petitioner to show that the deficient performance prejudiced the defense. <u>Id.</u> at 687. In order to satisfy the prejudice requirement of the two-prong test set forth in <u>Strickland</u>, defendant must show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." <u>Lockhart v. Fretwell</u>, 506 U.S. 364 (1993).

4

In addition, "a defendant who alleges ineffective assistance of counsel following the entry of a guilty plea has an even higher burden to meet." Hill v. Lockhart, 474 U.S. 52, 53-59 (1985). In the case of a guilty plea, the defendant must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985) (footnote omitted); Hooper v. Garraghty, 845 F.2d 471, 475 (4th Cir. 1988). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland 466 U.S. at 694.

It is further noted that a Court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonably professional assistance. Strickland 466 U.S. at 689-90. Moreover, there are no absolute rules in determining what is reasonable performance. See Hunt v. Nuth, 57 F.3d 1327, 1332 (4th Cir. 1995) (counsel's representation is viewed on the facts of a particular case and at the time of counsel's conduct).

**Ground One**

In this ground, the petitioner asserts that his counsel was ineffective for failing to challenge the government's quantity of methamphetamine based on established scientific methods and case law. Petitioner's main contention arises from the November 10, 2003 preliminary sentencing hearing testimony of DEA chemist Matthew Sider. According to the petitioner's complaint, the government used Mr. Sider to establish the hypothetical quantity of methamphetamine that would have been produced from the liquid mixture that was seized from the petitioner's meth laboratory. In his testimony, Mr. Sider estimated that, based on the amount of methamphetamine contained in the seized sample, the entire mixture would yield 63.3 grams of methamphetamine. During cross-examination, Mr. Sider also testified that a quantity of methamphetamine would be lost during the

5

steps that followed the cooking process. Petitioner asserts that this was a very important issue that his counsel negligently failed to question the witness on, and that had counsel fully developed this point, the Court would have recognized that Mr. Sider's estimate was significantly greater than what would have been the actual amount after the petitioner cooked the methamphetamine. This actual amount, the petitioner assumes, would be a yield closer to 16 to 21.2 grams, not the 63.3 grams approximated by Mr. Sider. Petitioner claims that this miscalculation increased his sentence by a range of 103 to 155 months and could have been avoided if his counsel had advanced these arguments throughout the preliminary sentencing hearing.

In spite of the petitioner's assertion that his counsel did not adequately address the issue of exactly how much methamphetamine the seized sample would likely have yielded, the record of the preliminary and final sentencing hearings belies this. In reviewing the sentencing record, it appears that petitioner's counsel continually attacked the government's estimation of how much methamphetamine the petitioner should be held accountable for, based on the amount of liquid seized from the petitioner's laboratory.

During his cross-examination of DEA chemist Sider, contrary to the petitioner's assertions, petitioner's counsel thoroughly litigated the issue of how much methamphetamine can be lost during the manufacturing or cooking process. Examples of this line of questioning began when counsel asked Sider about the determination of potential yield:

> Q: So, in other words, there is more than one way to determine what a potential yield would be in manufacturing methamphetamine?
>
> A: Yes. There are many limiting factors when manufacturing methamphetamine.
>
> Q: In fact, the National Clandestine Laboratory with the DEA performs those type of calculations, correct?

> A:   Calculations as?
>
> Q:   As to the potential yield from using pseudoephedrine and the red phosphorus method.
>
> A:   Yes, we do.
>
> Q:   And, for example, . . .

(CR. Dckt. 108, Preliminary Sentencing, p. 78).

Counsel continued this "decreased yield" theory by asking Sider:

> Q:   In other words, when you're trying to manufacture methamphetamine in the manner in which David Lynch was [in a cabin in Webster County, WV], you're not going to get 100 percent [yield], are you?
>
> A:   Well, in the cooking process, you will. If you let it cook long enough, it's all going to convert to methamphetamine.
>
> Q:   Don't you lose some things when you don't have perfect lab equipment?

(CR. Dckt. 108, Preliminary Sentencing, p. 80).

Later, counsel questioned the chemist on the seventeen milliliter sample taken from the seized liquid for testing:

> Q:   But you didn't do anything to figure out how much iodine, pseudoephedrine, red phosphorous, or water was in that 17 milliliters, correct?
>
> A:   No, I did not.
>
> Q:   Didn't you feel that was important?
>
> A:   No. We're not required to, and that really would have no effect on the amount of methamphetamine that's in there.
>
> Q:   Wouldn't it take certain amounts of pseudoephedrine, certain amounts of iodine, certain amounts of red phosphorous, and certain quantities of water to end up with a certain quantity of methamphetamine?
>
> A:   Yes, it would.

>   Q: You didn't do anything to determine those other volumes, to check your science, so to speak, did you?

(CR. Dckt. 108, Preliminary Sentencing, p. 82-83).

Counsel then attacked further attacked the chemist's calculation and testing process:

>   Q: You didn't have a powder, right?
>
>   A: No, I never had a specific powder, but the end product, if he had carried through the entire manufacturing, would have been in the hydrochloride salt form.
>
>   Q: But that's not the form you tested, right?

(CR. Dckt. 108, Preliminary Sentencing, p. 87).

In addition, petitioner's counsel continued advancing the "decreased yield" hypothesis during the examination of the petitioner's own expert witness, former West Virginia State Police chemist Robert White. In response to a question regarding methamphetamine yield, White testified that 60 percent is a reasonable yield. (CR. Dckt. 108, Preliminary Sentencing, p. 99). White further stated, "[I]f you have a 100-gram cook, you're going to get roughly 60-percent yield, which would be 60 grams." (CR. Dckt. 108, Preliminary Sentencing, p. 100).

Further, counsel also called the petitioner to the stand to detail the process of manufacturing methamphetamine as well as to comment on the inconsistent nature of production. While describing the first step of cooking the methamphetamine, counsel asked the petitioner:

>   Q: Up until this stage, you lose some of the product, don't you?
>
>   A: Oh yeah. You've got to have it perfect . . . or you lose part of your pseudoephedrine, and if you get it too hot, it will burn up. There's a lot of things that can go wrong with it.

(CR. Dckt. 108, Preliminary Sentencing, p. 108-109).

Later:

> Q: Okay. Now at this stage, do you lose some of the – some of the product?
>
> A: Yeah, you lose a lot of the iodine, the iodine crystals theirself.[sic].
>
> . . .
>
> Q: So if you have less iodine crystals, then the ultimate result of the methamphetamine is less?
>
> A: Right, because it won't create enough heat.

(CR. Dckt. 108, Preliminary Sentencing, p. 110).

Counsel concluded petitioner's testimony by asking:

> Q: When you gave your version of the offense, you were estimating what actually resulted, weren't you?
>
> A: I was estimating what I thought it would have made.
>
> Q: And, under ideal, better circumstances . . . it might have been 10 to 20 [grams produced]?
>
> A: If you had the perfect stuff, you might get 10 to 20 grams.
>
> Q: And that's why you're conceding that it's 10 to 20 grams [that would have actually been produced]?
>
> A: Right.

(CR. Dckt. 108), Preliminary Sentencing, p. 114-115).

Lastly, counsel further argued the calculation discrepancy issue at the final sentencing hearing on November 21, 2003. At this hearing, the petitioner's counsel reiterated for the Court "[a]s the Court is aware, there was great discrepancy among the Government's own witnesses as to the quantity which was being produced in Webster County." (CR Dckt. 109, Final Sentencing, p. 5-6). Referring back to the testimony of the government witness, counsel stated:

> . . . Mr. Sider testified, early on, that he believed the cooking process was in the latter stages but subsequently admitted that given the consistency of the liquid, the color of the liquid, the brown substance, that, I believe, that was the first of three stages of the process, and I believe Mr. Lynch explained that you lose product throughout this process, especially at the end.

(CR Dckt. 109, Final Sentencing, p. 6-7).

Counsel closed its argument by noting :

> [D]uring that last stage is when you lose a lot of the actual methamphetamine. In a perfect lab setting, you may have, indeed, gotten so many grams per milliliter of liquid, but in a facility out in the middle of nowhere, with mason jars and coffee pot filters and less than adequate equipment, you're not going to get that, and that's been Mr. Lynch's argument all along[.]

(CR Dckt. 109, Final Sentencing p. 7).

In this ground, the petitioner asserts that counsel failed to represent him to the best of his ability, and that counsel should have done a better job cross-examining the government's witnesses. The sentencing record, however, does not concur with the petitioner's claims.[1] As shown above, the sentencing transcripts contain multiple instances where counsel advanced the notion that the final product of methamphetamine could be significantly smaller than what was estimated by the government witness after the manufacturing process. The Court considered both arguments during sentencing and selected the government's estimation as the most accurate amount of methamphetamine that would have been produced. For all of these reasons, the petitioner has failed to show that counsel's performance was deficient in this regard.

**Ground Two**

In his second ground, the petitioner asserts that counsel was ineffective for failing to

---

[1] Nonetheless, such claim, even if true, would not rise to the level of a Sixth Amendment violation. *See* Yarborough v. Gentry, 540 U.S. 1, 8 (2003) (the Sixth Amendment guarantees reasonable competence, "not perfect advocacy judged with the benefit of hindsight.")

challenge the denial of his motion to suppress on direct appeal. The petitioner asserts that although counsel filed a direct appeal, counsel did not raise what the petitioner believed to be an important issue: the failure to challenge the district court's denial of his motion to suppress. In his motion to suppress, petitioner argued that a confidential informant did not have access to his methamphetamine laboratory, and thus his consent to search should be construed as a warrantless search in violation of the Fourth Amendment. The petitioner asserts that had this claim been raised on appeal, there is a reasonable probability that his conviction could have been significantly altered. Thus, the petitioner asserts that counsel was ineffective for not raising this issue on appeal.

With regard to ineffective assistance of counsel claims, using the aforementioned Strickland standard, the Sixth Amendment does not require appellate attorneys to press every non-frivolous issue on appeal. Jones v. Barnes, 463 U.S. 745, 751 (1983). Neither is appellate counsel required to raise every colorable claim on appeal. Id. at 754. To the contrary, "[w]innowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective advocacy." Smith v. Murray, 477 U.S. 527, 536 (1986) (internal quotations omitted). Therefore, counsel has great latitude to decide what issues to press on appeal, Cole v. Branker, 2008 WL 5999766 *9 (4th Cir. 2008), because "[a] brief that raises every colorable issue runs the risk of burying good arguments." Jones v. Barnes, 463 U.S. at 753. Additionally, when arguing that counsel failed to raise a specific claim on appeal, it is particularly difficult to overcome the presumption of effectiveness because the petitioner must show that the ignored claim was clearly stronger than those counsel did present. Smith v. Robbins, 528 U.S. 259, 288 (2000) (citing Gray v. Greer, 800 F.2d 644, 646 (7th Cir. 1986)).

In this case, the petitioner has not overcome the presumption that appellate counsel merely

"winnowed" out the weaker arguments on appeal to focus on those that he felt were more likely to prevail. Moreover, the petitioner has failed to show that the "ignored" claim was *clearly stronger* than those raised. At best, the petitioner has shown that this claim could have been raised on direct appeal, not that it should have been raised, or that it was more meritorious than those presented.

Additionally, the petitioner has failed to show that, but for counsel's failure to raise other issues on appeal, the result of that proceeding would have been different. To the contrary, an evidentiary hearing on the petitioner's motion to suppress revealed that the confidential informant ("CI") was the one actually rented the cabin that the petitioner used to manufacture methamphetamine; the CI negotiated the terms of rental with the cabin's agent's owner, wrote the check for its rent from his own account and received the key to the cabin in return; that the CI had the key to the cabin and exercised control and possession over the cabin; that the CI had a room at the cabin in which he maintained his clothing and personal possessions, and that the CI was the person who stocked the cabin with food and other necessities. The evidence at the hearing also revealed that at the time the police gained entry to the cabin, the CI had already given them written and verbal consent to conduct a warantless search, and, given the above-mentioned circumstances, the police reasonably believed that the CI had the authority to give such consent. Accordingly, the petitioner has failed to establish that counsel was ineffective on appeal for failing to challenge the denial of his motion to suppress.

### III. <u>Conclusion</u>

For the reasons set forth in this opinion, the undersigned recommends that the Court enter an Order **DENYING** the petitioner's § 2255 motion and his motion for an evidentiary hearing and **DISMISSING** this case with prejudice.

Within ten (10) days after being served with a copy of this Recommendation, any party shall file with the Clerk of the Court written objections identifying those portions of the Recommendation to which objections are made, and the basis for such objections. A copy of such objections shall also be submitted to the United States District Judge. Failure to timely file objections to the Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Recommendation. 28 U.S.C. § 636(b)(1); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984), <u>cert. denied,</u> 467 U.S. 1208 (1984).

The Clerk is directed to send a copy of this Opinion/Report and Recommendation to the *pro se* petitioner by certified mail, return receipt requested, to his last known address as shown on the docket. The Clerk is further directed to provide copies of this Opinion/Report and Recommendation to counsel of record via electronic means.

DATED: August 10, 2009.

*John S. Kaull*
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE